IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
FILE NO.:

| | |
|---|---|
| **COLIN SHAKESPEARE** and **SONYA SHAKESPEARE**<br><br>Plaintiffs,<br><br>v.<br><br>**NOVANT HEALTHCARE, INC.**, and **FABIOLA PIERCY**.<br><br>Defendants. | **COMPLAINT FOR DAMAGES**<br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR DAMAGES

**NOW COMES** Mr. Colin Shakespeare ("Mr. Shakespeare") and Mrs. Sonya Jackson-Shakespeare ("Mrs. Shakespeare") (collectively "Plaintiffs" or the "Shakespeares"), Plaintiffs in this action, by and through the undersigned counsel, to file this Complaint against the above-named Novant Health, Inc. ("Novant" or "Defendant Hospital") and Fabiola Piercy ("Ms. Piercy" or "Defendant Piercy") and in support thereof state as follows:

## INTRODUCTION

This is a medical-malpractice case that concerns Mr. Colin Shakespeare and his wife, Mrs. Sonya Shakespeare-Jackson. Within a day of arriving at Defendant Novant's hospital, their lives were irrevocably altered. There, Mr. Shakespeare <u>walked</u> into Defendant Hospital, seeking treatment for mild-like stroke symptoms. Due to the medical

malpractice of Defendants, Mr. Shakespeare had a second much more severe stroke that was unequivocally caused by Defendants medical malpractice. Several physicians reported in their notes both that Defendants caused Mr. Shakespeare to have a second stroke and that second stroke severely disabled him. Due to Defendants' medical malpractice, Mr. Shakespeare's brain was swollen; he could hardly speak; and he was non-responsive for almost a week. When Defendants discharged Mr. Shakespeare, Ms. Shakespeare <u>rolled</u> her husband out in a wheelchair. As such, Mr. Shakespeare's range of motion, mental agility and everyday functions have fundamentally changed. Ms. Shakespeare found herself the caregiver of her husband and sole functioning parent, thereby causing irreversible strain on their family and children. As such, the Shakespeares bring this action against Defendants to recover for their losses and pain and suffering and all other damages.

## JURISDICTION AND VENUE

1. This action is based on diversity under 28 U.S.C. § 1332. Venue is proper under 28 U.S.C. § 1391. Defendant's place of business is located in the state of North Carolina and all material events leading to this cause of action occurred in Mecklenburg County, located in the Western District of North Carolina. Plaintiffs are citizens of Florida. The amount in controversy is in excess of $75,000.00. Plaintiff, Ms. Shakespeare brings derivative state-law claims under North Carolina law.

## PARTIES

2. Plaintiff **COLIN SHAKESPEARE ("Mr. Shakespeare")** is a citizen of Florida. Mr. Shakespeare has been a successful entrepreneur for many years with a vibrant personality, an active lifestyle and a loving family with two children with his wife. Mr. Shakespeare is very charismatic. Mr. Shakespeare is an international traveler,

who loves new challenges and people. Mr. Shakespeare was also the main provider of his family.

3. Plaintiff **SONYA JACKSON-SHAKESPEARE ("Mrs. Shakespeare")** is a citizen of Florida. Mrs. Shakespeare is a successful real estate broker licensed in Florida and Georgia. She is a loving mom and wife and has been primarily dependent on the love and affection of her husband for a decade. Ms. Shakespeare's loves the arts, caring for her children and spending time with family.

4. At all times relevant hereto, Defendant **NOVANT HEALTHCARE, INC., ("Defendant Novant" or "Defendant Hospital")**, is a private non-profit corporation organized and existing under the laws of the State of North Carolina with its principal place of business located at 2085 Frontis Plaza Boulevard, Winston Salem, NC 27103. At all times relevant hereto, Defendant Novant Healthcare was responsible for the policy, practice, supervision, implementation and conduct of all matters and was responsible for the appointment, training, supervision, discipline and retention, and conduct of all Defendant Novant's personnel. Defendant Novant's employees' actions are imputed to it pursuant to *respondent superior*.

5. At all times relevant hereto, Defendant **FABIOLA VASQUEZ PIERCY ("Defendant Nurse Piercy")** is a citizen of the State of North Carolina, Gaston County and was acting as an agent of Defendant Hospital in her capacity as nurse. She is a registered nurse who is licensed by the State of North Carolina. Defendant Nurse Piercy's actions are imputed to Defendant Novant pursuant to *respondent superior*.

## BACKGROUND FACTS

6. On January 8, 2020, Defendant Hospital processed and admitted Mr. Shakespeare into its triage unit and diagnosed him with an ischemic stroke moments

after he arrived at Defendant Novant. The triage unit is less severe than the intensive care unit ("ICU") and where patients are sorted out based on need.

7. Defendant Hospital admitted and assigned Mr. Shakespeare to admit provider, Swaroop Abhimanyoo Pawar, MD ("Doctor Pawar"), attending provider Jerry D. Nix, MD ("Doctor Nix"), and charge nurse Tanisha Coleman, RN, BSN ("Nurse Coleman"). Nurse Coleman was a stroke certified nurse, meaning she cares almost exclusively for stroke patients.

8. Mr. Shakespeare was assessed by Doctor Nix, who noted that Mr. Shakespeare was alert and fully oriented upon admission. He also commented that Mr. Shakespeare presented in the emergency room on January 8, 2020, with slurred speech, numb left arm and loss of left arm coordination. Otherwise, Mr. Shakespeare was awake with fully altered mental status and fully oriented. Mr. Shakespeare's heart rate, respiratory, range of motion neurological were all normal, as well as his behavior and judgment and thought content. Mr. Shakespeare only exhibited slight weakness in grip and ever so slightly slurred speech.

9. Additional testing by way of axial scans were conducted patient's brain for which showed that patient had suffered from a stroke but his progress was stable.

10. Doctor Nix devised a treatment plan that required medical professionals to maintain Mr. Shakespeare's blood pressure artificially high, at 220/110. This course of treatment was designed to maintain perfusive blood flow. Perfusion was used to force the brain to create new blood vessels. Doctor Nix's treatment plan was prominently noted on a 3x4 foot board in Mr. Shakespeare's room, and was visible to anyone who walked in the room. Furthermore, it is the protocol of Defendant Novant to prominently place patient treatment on such boards to decrease any misdiagnosis or mistreatment.

11.     Doctor Nix ordered Labetalol in order to maintain Mr. Shakespeare's blood pressure. Labetalol is used to treat high blood pressure. Labetalol is in a class of medications called beta blockers. It works by relaxing blood vessels and slowing heart rate to improve blood flow and decrease blood pressure.  Doctor Pawar authorized Hydralazine to maintain Mr. Shakespeare's blood pressure. Hydralazine is a medication that lowers blood pressure. It is not a first-choice drug, but it can be helpful for people who have high blood pressure and other first-choice drugs are not working.

12.     On January 9, 2020, Mr. Shakespeare responded positively to Doctor Nix's treatment plan. Throughout the day, Mr. Shakespeare began to work with a physical therapist.  On his way to physical therapy, Mr. Shakespeare was talking, joking, walking and dancing. Doctor Nix and the medical team anticipated that they would discharge Mr. Shakespeare by Saturday, January 11, 2020.

13.     However, Mr. Shakespeare's health took an unfortunate turn when, later that day, on January 9, and through Friday, January 10, 2020, Defendant Novant assigned a new charge nurse to care for Mr. Shakespeare, Fabiola Piercy ("Defendant Nurse Piercy").  Defendant Nurse Piercy was a "floating nurse" who had no specialized care for stroke patients.

14.     Mr. Shakespeare's medical records show that Defendant Nurse Piercy administered two bolus shots of Hydralazine less than thirty (30) minutes apart, in conjunction with Noel Miekle's ("Nurse Miekle") order of titration of Labetalol.  A bolus shot is a direct injection in the blood vessel. This caused Mr. Shakespeare's blood pressure to plummet. Such drastic drop was inconsistent with Mr. Shakespeare's treatment plan and standard of care:

| 1/8/2020 | 0146 | Mr. Shakespeare admitted to ER |
|---|---|---|
| | 0209 | Doctor Nix orders Labetalol ("LAB"), 20mg. |
| | 0212 | Physician Assistant Yves Damas administers 10mg LAB. |
| | 0212 | Physician Assistant Yves Damas administers 10mg Hydralazine ("HYD"). |
| | 0718 | Nurse Miekle (Miekle) administers 10mg LAB. |
| | 0718 | Physician Assistant Yves Damas administers 10mg HYD. |
| 1/9/2020 | **0813** | **Nurse Miekle orders titration of meds "careful not to induce sharp spikes or drops."** |
| | 1213 | Discharge planning meeting. |
| | 1526 | Nurse Miekle orders 10mg HYD drip. |
| | **1639** | **Defendant Nurse Piercy administers additional HYD (bolus).** |
| | **1707** | **Defendant Nurse Piercy administers second additional HYD (bolus).** |
| | 1707-1918 | Patient's BP drops from 214/116 to 158/86. |

15. Defendant Nurse Piercy provided no medical rational for her drastic reduction of Mr. Shakespeare's blood pressure except that she thought that Mr. Shakespeare's systolic blood pressure was high and did not feel comfortable maintaining it at that level.

16. After Defendant Nurse Piercy administered the two bolus shots in conjunction with the titration, she left Mr. Shakespeare and failed to check on the status of the rapid reduction in pressure or how Mr. Shakespeare's body might respond to such rapid decline in pressure.

17. Due to Defendant Nurse Piercy's actions, Mr. Shakespeare had a second stroke almost immediately. Nurse Coleman discovered Mr. Shakespeare with a facial droop almost two hours after Defendant Nurse Piercy administered the second bolus dose and immediately transferred Mr. Shakespeare to ICU.

18. A timeline of Mr. Shakespeare's treatment on January 9, 2020, at Defendant Novant can be seen in the chart below:

|  | 1918 | Nurse Coleman finds Shakespeare with facial droop and immediately transfers him to ICU for stroke. |
|---|---|---|
|  | 1926 | Nurse Kris Scoggins writes that stroke code activated. |
|  | 1934 | Respiratory therapist called in. Stroke concern, per RN. |
|  | **2024** | **Doctor Duane Campbell ("Doctor Campbell") states that stroke worsened after administration of HYD. NIHSS went from 2 to a 10.** |
|  | 2311 | Admitted to neurological ICU ("NICU"). |

19. Physician comments in Mr. Shakespeare's medical records show that Defendant Nurse Piercy caused Mr. Shakespeare to have a second stroke because she reduced his blood pressure rapidly:

 a. **Physical Therapist Stephanie Gher**: "admitted [on] 1/8 . . . [condition] worsened after receiving hydralazine  . . . ."

 b. **Physician Assistant Tara L. Halpin**: "The pt apparently received hydralazine on the floor on 01/10/2020 which caused a decrease in blood pressure and subsequently resulted in worsening left sided weakness. NIHSS 10. Pt was transferred to the ICU for BP augmentation" and "Pt had worsening Left sided weakness after hypotension from hydralazine."

 c. **Doctor Campbell:** "Admit with recent subacute stroke but worsened today after getting hydralazine".

 d. **Nurse Meikle**: "On 1/ 10, the patient had a sudden decline in his exam with an increase in his NIHSS to 10. This was after the patient was given hydralazine for an elevated blood pressure."

e. **Doctor Laurie McWilliams**: "expansion of stroke in setting of lower blood pressures after hydralazine".

   f. **Doctor Miraj B. Patel**: "On 1/10, the patient had a sudden decline in his exam with an increase in his NIHSS to 10. This was after the patient was given hydralazine for an elevated blood pressure. Per chart review BP decreased from 214/116 to 158/86 after receiving hydralazine."

20. There is no doubt that Defendant Nurse Piercy caused Mr. Shakespeare to have a second stroke and caused his condition to worsen drastically and be admitted to the ICU.

21. Nurse Coleman recorded "Noted change in patient. NIHSS went from 2 to 10." This is the condition that Nurse Coleman found Mr. Shakespeare in.

22. "NIHSS" is the NIH Stroke Scale. NIHSS measures the severity of a stroke. The higher the number, the more severe the stroke and impairment.

23. Mr. Shakespeare stayed in ICU for a week. But prior to Defendant Nurse Piercy's actions, Doctor Nix had agreed to release Mr. Shakespeare with no further care.

24. In the ICU, Mr. Shakespeare's brain was swollen, his blood pressure increased, speech decayed and his range of motion severely decreased. The ICU team provided routine and constant treatment to Mr. Shakespeare.

25. This treatment included several days of intense fluid and IV treatment and medications. Upon regaining his mental status, Mr. Shakespeare realized that he could not walk, stand, and had no feeling in his legs. Mr. Shakespeare could not even raise his arm.

26. Mr. Shakespeare also required additional treatments following discharge from Defendant Hospital. At discharge, Defendant Hospital ordered intermittent,

skilled nursing care, physical therapy, and speech therapy. Due to the nature of Mr. Shakespeare's illness, he could barely get out of bed and is a young man who has to walk with a cane to get around.

27. Because of Defendant Nurse Piercy's actions, Mr. Shakespeare has been severely damaged. Mr. Shakespeare needs physical therapy. He is unable to process and talk as he did on day two (2) of his visit to Hospital. At one point, he was unable to stand without assistance. His whole life has been altered since Defendant Nurse Piercy decided to go against doctor's orders and prescribe her own treatment and lower not only lower his blood pressure, but lower it rapidly.

28. Mr. Shakespeare also suffers from depression and mental instability now. He looks at himself and sees only a fraction of who he was. Mr. Shakespeare copes daily with the fact that he does not walk, write, talk, think or function normally.

29. The flow of blood in stroke victims is imperative to survival and recovery, and the lack thereof is recognized to lead to complications. If not promptly investigated and addressed it will lead to further harm of the patient. This is what occurred in Mr. Shakespeare's case. This complication is so well known that numerous articles have been written spelling out the importance of the physicians involved in the procedure to be keenly aware of this possibility and to address it promptly.

30. For example, Doctors Sully Xiomara Fuentes Patarroyo and Craig Anderson write that:

> While positive associations between BP levels and poor outcomes are evident across a range of studies, very low BP levels and large reductions in BP have also been shown to predict death and dependence, more so for ischaemic stroke (IS) than intracerebral haemorrhage (ICH). Accumulating evidence indicates that early BP lowering can reduce haematoma expansion in ICH, but there is uncertainty

over whether this translates into improved clinical outcomes, particularly since such an effect was not evident from haemostatic therapy in clinical trials.[1]

31. Clinicians must be aware of this silent but dangerous complications that can occur during many seemingly routine operative procedures and interventions, especially those whom decide to operate counter to doctor's orders. And, in particular, note that what blood pressure may seem high for one patient, is necessary for another, as prescribed by a treating physician.

32. Several physicians have written about the benefits of perfusion treatments in stroke patients in articles for the National Institute of Health, including an article entitled: Utility of Perfusion Imaging in Acute Stroke Treatment: A Systematic Review and Meta-Analysis. In said article, the physicians note that more patients who received perfusion treatments had better outcomes than those who were not provided profusion treatments.[2]

33. There is no viable reason or excuse as to why Defendant Nurse Piercy, who was simply a floater, thought she did not have to abide by physician's orders and even the physicians who were responsible for Mr. Shakespeare's care could not understand why she would not abide by the procedures that were implemented to save Mr. Shakespeare's health.

34. Mr. Shakespeare suffered severe lifestyle changes and his pain and suffering continued even after seeking medical treatment and has continued along with his prolonged medical treatment. Mr. Shakespeare was tremendously affected by the embarrassment of being unable to speak, walk, clean himself, use the restroom and to

---

[1] https://journals.sagepub.com/doi/pdf/10.1177/2040622312450183
[2] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5890922/pdf/nihms955206.pdf

have to have these vulnerabilities exposed to the public. In addition, his life and dya-to-day routine day were severally impacted by his inability to simply get out of bed and he has sustained other injuries.

35. Furthermore, provided that Mr. Shakespeare was injured during the initial phases of the COVID-19 pandemic, Mr. Shakespeare was forced to expose himself to medical treatment during the midst of the pandemic when those whom have preexisting conditions are at greater risk of having severe complications.

36. Mrs. Shakespeare's life has been equally altered. She no longer has the comfort of her spouse and companion. Nor does she have the financial support that she once had from Mr. Shakespeare. Mrs. Shakespeare had to leave the comfort of her home with her children and go back into the workforce.

37. Mr. and Mrs. Shakespeare used to enjoy a passionate, spontaneous and intimate relationship. However, the romantic aspects of their relationship have been all but stripped away as a result of this accident. Mrs. Shakespeare finds herself in mourning for the loss of the vibrant person her husband once was, instead sharing a home with someone who is a shadow of his former self. She feels isolated and alone in a life that was supposed to be filled with love and mutual support.

38. Mrs. Shakespeare had to put her life on hold to care for Mr. Shakespeare from the time of his accident until July of 2020. During this time, she provided round-the-clock care to Mr. Shakespeare, including performing his ablutions with him and assisting him in cleaning himself. This was degrading and humiliating for both parties and directly led to distance between this couple that had been happily married for over a decade.

39. Even after Mr. Shakespeare had recovered enough that he no longer needed round the clock care, Mrs. Shakespeare's role did not become any easier. She began

working extremely long hours to provide for her family as the sole breadwinner. Even so, she was unable to match the income that they shared when Mr. Shakespeare was able to work.

40. Due to the loss of Mr. Shakespeare's income, Mrs. Shakespeare's quality of life suffered. Mrs. Shakespeare's job requires her to travel 2,000 to 3,000 miles every month between Florida and Georgia. With less income, two of their cars were repossessed, including the one that she used for her business. This forced Mrs. Shakespeare to drive a car that was much older, frequently broke down and was simply not as well suited to her business, making her job that much more difficult.

41. In addition to her financial losses, Mrs. Shakespeare has experienced a substantial amount of trauma from this incident. As a direct result of Mr. Shakespeare's injury and the incredible weight that was suddenly thrust upon her to provide for her family on only her income, as well as to step in with every household duty that Mr. Shakespeare could no longer perform, Mrs. Shakespeare's mental and emotional health suffered. She was diagnosed with anxiety and prescribed medication to cope with it.

42. The care that Mr. Shakespeare required also brought back traumatic memories of helping to care for her grandmother after she suffered a stroke when Mrs. Shakespeare was a girl. This trauma drove the wedge between her and her husband still deeper.

43. Tragically, this incident has also impacted the other foundational relationship in her life; her relationship with her children. Both of her teenage sons have experienced severe psychological and emotional distress. This distress has been directly linked by their therapist to their father's condition and seeing him in such a degraded state. One of them has acted out verbally and physically, including self-harm, in his

attempt to cope with this situation. This has laid additional burdens on Mrs. Shakespeare's shoulders as she attempts to raise these two teenage boys without any assistance from Mr. Shakespeare, who is still physically and mentally incapable of being present for major milestones in their lives.

44. Previously, Mr. Shakespeare had been extremely involved in the lives of his children. He shared transportation duties with Ms. Shakespeare, taking them to social gatherings and often took them to sporting events or to a local track where they participated in cart racing. Now it is solely Mrs. Shakespeare's responsibility ensure that her sons are able to enjoy the basic activities of youth, and she cannot participate in all of these activities the way that Mr. Shakespeare used to.

## CLAIMS FOR RELIEF

### Count I
### Negligence
### (Against All Defendants)

45. Plaintiffs incorporate all preceding paragraphs as if set forth fully herein.

46. Defendants owed a duty of care to Mr. Shakespeare.

47. Defendants breached that duty through acts and omissions including, but not limited to, ignoring key components of the medical plan devised by his physicians, giving him too much medication too quickly and failing to properly monitor Mr. Shakespeare's blood pressure after giving him medication which was designed to drop his blood pressure.

48. Defendants also breached that duty by failing to properly monitor the administration of medications and/or the failure to determine situations in which multiple doses of medication could be administered.

49. Defendants breached that duty by failing to check with medical professionals prior to the administration of the two bolus shots, especially considering the fact that Mr. Shakespeare's other blood pressure medications were in the process of being titrated.

50. Defendants breached that duty by failing to inform medical professionals that two bolus shots had been administered.

51. By breaching this duty, Defendants caused Mr. Shakespeare to suffer a second stroke which drastically worsened his condition, put him mortal danger and caused lasting and likely permanent damage.

52. As a result of Defendants' negligence, Mr. Shakespeare has suffered damages.

## Count II
## Negligent Infliction of Emotional Distress
## (Against All Defendants)

53. Plaintiffs incorporate all preceding paragraphs as if set forth fully herein.

54. Defendants acted negligently and/or with reckless disregard for the pain and suffering they would inflict by allowing an inexperienced nurse to gain unfettered access to a stroke patient.

55. Defendants knew or should have known that a drastic reduction in blood pressure could cause trauma, including death.

56. Defendants did, in fact, cause a drastic drop in Mr. Shakespeare's blood pressure, leading to massive physical and mental trauma.

57. Through their negligence, Plaintiffs inflicted severe emotional distress on Plaintiffs.

58. As a result of Defendants' actions, Plaintiffs have both experienced depression and anxiety.

## Count III
## Loss of Consortium/Alienation of Affections
## (Against All Defendants)

59. Mr. and Mrs. Shakespeare were married at the time of the incident and continue to be married.

60. Prior to the incident, Mr. and Mrs. Shakespeare had a loving, affectionate, passionate and spontaneous relationship.

61. Due to the actions of Defendants, Mr. Shakespeare suffered a severe and debilitating injury that has caused changes in his disposition personality and physical abilities.

62. The Mr. Shakespeare's injuries have caused Mrs. Shakespeare to lose the loving and supportive relationship that she had previously enjoyed with Mr. Shakespeare.

63. Mrs. Shakespeare has lost the partner in her relationship, with Mr. Shakespeare being unable to contribute financially to the household, nor to perform other duties which had previously engaged in.

64. The Shakespeare's children have suffered severe emotional distress directly related to their father's condition as diagnosed by a therapist. This has caused a severe rift between the Shakespeares and their children.

65. Were it not for the tortious conduct of Defendants, Plaintiffs' marriage would still be healthy and thriving, as would their relationship with their children.

## Count IV
## Negligent Hiring and Supervision
## (Against Defendant Novant)

66. Plaintiffs incorporates all previous paragraphs as if stated fully herein.

67. Defendant Novant allowed a floating nurse who did not have sufficient experience with the complex and medical procedures regarding strokes to care for Mr. Shakespeare.

68. Defendant Novant knew, or should have known, that the floating nurse (Defendant Nurse Piercy, upon information and belief) was not sufficiently trained or experienced to care for Mr. Shakespeare at this stage of his recovery.

69. Defendant Novant failed to provide another stroke certified nurse to care for Mr. Shakespeare when Defendant Novant knew, or should have known, that such expertise was necessary to the care of Mr. Shakespeare.

70. Were Defendant Nurse Piercy properly supervised, she would not have lowered his blood pressure against the regimen devised by Mr. Shakespeare's doctors.

71. Were the Defendant Nurse Piercy properly supervised, she would have attended to Mr. Shakespeare with sufficient frequency to detect his drop in blood pressure before it resulted in a stroke or, at a minimum, detected the symptoms of a stroke early enough to prevent Mr. Shakespeare from such severe trauma.

**Count V**
**Punitive Damages**
**(Against All Defendants)**

72. Plaintiffs incorporate all previous paragraphs as if stated fully herein.

73. Defendants owed a duty of care to Mr. Shakespeare as a patient of Defendants.

74. Defendants recklessly and callously breached that duty through their acts and omissions resulting in Mr. Shakespeare's stroke, including, but not limited to, failing to check his blood pressure at appropriate intervals despite clear instructions to do so,

especially after the administration of blood pressure medication delivered via a bolus shot when his intravenous blood pressure medication was already being titrated.

75. Defendants actions constitute gross negligence.

76. Plaintiffs can never be made truly whole for the loss of enjoyment of life that they have suffered due to Defendants' negligence

77. Strong corrective measures are needed to ensure that such negligence does not harm others situated similarly to Plaintiffs.

78. For these reasons, punitive damages are required in order to correct Defendants' actions, protect others and to bring Plaintiffs some semblance of closure.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment be entered on their behalf against Defendants and grant the following relief:

A) An award of compensatory damages for Plaintiffs, in an amount to be determined by the enlightened conscience of the trier of fact against Defendants;

B) An award of pre-judgment and post-judgment interest;

C) An award of costs, including, but not limited to, discretionary costs;

D) Attorneys' fees and expenses incurred in pursuing this case under all applicable federal and state statutes.

E) Any other and further relief this Court deems just and proper; and

F) Any other and further relief to which they may be entitled.

With respect to Plaintiffs' Count V for punitive damages, Plaintiffs requests judgment against Defendants for:

A) Punitive damages sufficient to punish each Defendant and deter others from like misconduct;

B) Costs of suit; and,

C) Such other relief available under law and deemed just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demands trial by jury in open court on all Counts. Respectfully submitted this 18th day of July, 2022.

PLANTIFFS

COLIN SHAKESPEARE

SONYA JACKSON-SHAKESPEARE

By their Attorney:

/s/Sharika M. Robinson
SHARIKA M. ROBINSON,
North Carolina Bar No.: 44750
THE LAW OFFICES OF SHARIKA M ROBINSON, PLLC
10230 Berkeley Place Drive, Suite 220
Charlotte, NC 28262
Telephone: (704) 561 6771
Telefax:    (704) 561-6773
*Attorney for Plaintiffs*